**WO** **LMH**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ray Thomas, | No. CV 04-1493-PHX-SMM (GEE) |
| Plaintiff, | **ORDER** |
| vs. | |
| Antonio Baca, et al., | |
| Defendants. | |

Plaintiff Ray Thomas, a state prisoner, filed this civil rights action claiming that he was exposed to second-hand smoke and denied a job assignment due to a disability. Presently pending is Defendants' Motion for Summary Judgment (Doc. ##52-53). Plaintiff responded, and Defendants replied (Doc. ##58-62). The Court will grant Defendants' motion except for Count I against Defendant Duran.

**I. Background**

In his Amended Complaint, Plaintiff sued Arizona Department of Corrections Director Dora Schriro, Deputy Warden Antonio Baca, and Correctional Officer Duran. Plaintiff brought two counts: (I) that Defendants exposed him to second-hand smoke while he was living at the Barchey Unit of the Arizona State Prison Complex in Buckeye; and (II)(a) that Deputy Warden Baca violated Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act by denying Plaintiff's request for a certain job clearance because of

his mental health score, and (b) that Baca violated Plaintiff's First Amendment rights by not allowing him to grieve the issue (Doc. #22).

Defendants moved for summary judgment, contending that (1) Plaintiff failed to show that they were deliberately indifferent to his exposure to second-hand smoke; (2) (a) the ADA does not apply to persons in their individual capacity, and Plaintiff can only seek injunctive relief against Baca in his official capacity, (b) Plaintiff does not meet the standard for relief because he is not disabled, he was not otherwise qualified for the job, and he was not excluded based on his disability; (3) Plaintiff did not exhaust his First Amendment claim, and his rights were not violated; and (4) Defendants are entitled to qualified immunity (Doc. #52). In support, they filed a Statement of Facts that refers to exhibits attached to a Court-ordered report that was previously filed (Doc. ##49, 53).

Plaintiff responds that disputed material facts prevent summary judgment, and qualified immunity is not warranted (Doc. #58).

**II. Summary Judgment Standard**

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). When considering a summary judgment motion, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). These inferences are limited, however, "to those upon which a reasonable jury might return a verdict." Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1220 (9th Cir. 1995).

Rule 56(c) mandates the entry of summary judgment against a party who, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. Celotex, 477 U.S. at 322-23. In such a situation, there can be no genuine issue of

1  material fact, since a complete failure of proof concerning an essential element of a
2  nonmoving party's case necessarily renders all other facts immaterial.  Id.

3  **III.  Count I:  Environmental Tobacco Smoke**

4      **A. Factual Background**

5      Plaintiff asserts that he quit smoking 12 years ago and is now allergic to smoke.
6  Smoke causes his eyes to burn, his nose to run and pain in his throat (PSOF Ex. L, Pl.'s Aff.
7  ¶ 2, Doc. #59; Supp. to Ex. L, Doc. #61).  He lived at the Barchey Unit for 14 months from
8  July 7, 2003, to September 9, 2004.  His "run" had 33 men, and 28 of them smoked (PSOF
9  Ex. L, Pl.'s Aff. ¶ 3).  The unit was locked down for 21 hours each day, and someone was
10  always smoking (Id. ¶¶ 3, 11).  Plaintiff believed that if he identified the smokers, he would
11  be labeled a snitch (Id. ¶ 4).  Also, tobacco products are sold in the prison store and for the
12  year 2004, total sales were about $18,100 (PSOF Ex. A).

13      Plaintiff asserts that on three or four occasions, he asked Defendant Duran to move
14  him to another housing unit (PSOF Ex. L, Pl.'s Aff. ¶ 5).  She told him that her "hands were
15  tied" (Id.).  Defendants contend that Duran did not have authority to move him (DSOF ¶ 35
16  & Doc. #49, Ex. C, Duran Aff. ¶ 11).  In her affidavit, however, Duran asserts that she could
17  move an inmate only with approval of her supervisor and only for "valid reasons" (Id. ¶ 6).
18  Duran also asserts that Plaintiff never complained to her about second-hand smoke, and that
19  he asked to be moved to be closer to an inmate he had befriended (Id. ¶ 11).

20      Plaintiff asserts that disciplinary tickets did not stop the smoking (PSOF Ex. L, Pl.'s
21  Aff. ¶ 6).  Duran states that she issued tickets for smoking, though she asserts that she has
22  never heard a smoke alarm go off due to smoking (PSOF Ex. B, ¶¶ 7-9; Duran Aff. ¶ 13).

23      On October 28, 2003, Plaintiff submitted an inmate letter stating that he was a
24  nonsmoker and was forced to live in an environment where he was exposed to smoke (PSOF
25  Ex. C).  He then filed a grievance seeking protection from second-hand smoke because he
26  lived "in a dorm in which 24/28 people smoke" (Id.).  He received a response from Lt.
27  Garner (not a Defendant) that prison policy prohibited smoking (Id.).  Plaintiff appealed the
28  decision, and on November 24, 2003, Defendant Deputy Warden Baca replied:

> Staff enforce smoking regulations every shift as evidenced by the number of tickets submitted and processed by the Disciplinary Coordinator at Barchey. As per DI 140 you live in a smoke free environment. Your grievance is resolved.

(Id.).

Plaintiff appealed Baca's decision, stating that very few violators were caught and that Plaintiff's right to live in a smoke-free environment was not protected as long as the store sold tobacco (PSOF, Ex. D). On June 7, 2004, Director Schriro replied that "there is zero tolerance for smoking in all state buildings" and that "[s]taff is aware of the smoking problem and all efforts are being made to assure that smoking only takes place in designated areas" (Id.). She further advised that appropriate action would be taken if a violator was apprehended (Id.).

To support his claim that second-hand smoke poses a health problem, Plaintiff submitted a report by Action on Smoking and Health, describing the numerous health risks posed by exposure to environmental tobacco smoke (PSOF, Ex. E).

Defendants contend that Plaintiff cannot show deliberate indifference because (1) prison policy bans smoking indoors and a violation of the ban subjects an inmate to disciplinary action, (2) smoke detectors were installed in the housing areas and inmates may file grievances for violations, (3) portable hand-held lighters are prohibited and electric lighters are available outside where smoking is allowed, and (4) inmates have several opportunities to go outside each day to smoke. These assertions are supported by the affidavit of Defendant Baca (DSOF ¶¶ 26-34 & Doc. #49, Ex. A ¶¶ 23-27). In Defendants' Reply, they additionally contend that Plaintiff's employment at the prison meant that he spent a significant amount of time outside of his housing area and thus was not constantly exposed to second-hand smoke (Reply at 2-3 & Ex. A, Ullrich Aff. ¶¶ 5-7).

**B. Analysis**

**1. Objective prong**

The Eighth Amendment is violated when prison officials, with deliberate indifference, expose an inmate to levels of smoke that pose an unreasonable risk of serious damage to his future health. Helling v. McKinney, 509 U.S. 25, 35 (1993). To prove the first objective

- 4 -

1  element, the prisoner must show that (1) he is being exposed to unreasonably high levels of
2  second-hand smoke, and (2) the exposure creates a risk of harm "so grave that it violates
3  contemporary standards of decency to expose *anyone* unwillingly to such a risk." Id. at 35-
4  36 (emphasis in original). "In other words, the prisoner must show that the risk of which he
5  complains is not one that today's society chooses to tolerate." Id.

6  Defendants contend that Plaintiff cannot satisfy the objective prong because he was
7  a smoker during his incarceration and because prior to his incarceration, he had a history of
8  using drugs by smoking. To support this assertion, they refer to medical progress notes
9  indicating that Plaintiff said he had quit smoking on April 22, 2002; June 9, 2003; and
10 November 20, 2003 (DSOF ¶¶ 20-21, 23 & Doc. #49, Ex. B). In response, Plaintiff asserts
11 that the notes are explained by the fact that he quit smoking 12 years ago and when asked by
12 physicians on those dates, he merely replied that he had quit smoking (Doc. #61).

13 It is irrelevant that Plaintiff may have intermittently smoked while in the prison and
14 used drugs before his incarceration. The objective standard requires a showing of exposure
15 to unreasonably high levels of second-hand smoke, not that an inmate have no history of
16 smoking or drug use. Certainly, many inmates have similar personal histories regarding use
17 of tobacco and drugs, and those histories do not justify exposure to second-hand smoke that
18 poses an unreasonable risk to future health. Thus, Defendants are not entitled to summary
19 judgment on the objective prong.

20 **2. Subjective prong**

21 For the subjective component, the inmate must show that the official knew of and
22 disregarded an excessive risk to inmate safety. Farmer v. Brennan, 511 U.S. 825, 837
23 (1994). The official must both be aware of facts from which the inference could be drawn
24 that a substantial risk of serious harm exists, and the official must also draw the inference.
25 Id. For a claim of exposure to second-hand smoke, this factor is determined in light of the
26 prison authorities' current attitudes and conduct, and the realities of prison administration.
27 Helling, 509 U.S. at 36. The adoption of a policy providing for smoking in designated area
28 bears heavily on this inquiry. Id.

### a. Director Schriro

There is no evidence to show that Director Schriro acted with deliberate indifference. The only evidence regarding her conduct is that she replied to a grievance appeal filed by Plaintiff. Her reply emphasized that there was "zero tolerance" for smoking in state buildings, and that staff members were making efforts to assure that smoking only took place in designated areas. Also, the Department Order Manual of the Arizona Department of Corrections expressly prohibits inmates from smoking inside any building. Ariz. Dep't of Corr., D.O. 109.03 (1.1) (eff. Sept. 1, 1996). There is no evidence to show that she disregarded any risk to inmate health. She is entitled to summary judgment on this claim.

### b. Warden Baca

Similarly, there is no evidence to show that Warden Baca acted with deliberate indifference. The only evidence regarding Baca's conduct is that he replied to a grievance appeal that smoking regulations were enforced, as shown by the number of disciplinary tickets issued, and that prison policy required a smoke-free environment. There is no evidence, for example, that Baca declined to enforce the smoke-free policy or that he personally had knowledge that the policy was not enforced against inmates on Plaintiff's run. Also, the fact that the prison store sold tobacco for smoking outdoors or in designated smoking areas does not demonstrate deliberate indifference, particularly considering that disciplinary violations were issued for inmates who violated the rules. Plaintiff admits that he was unwilling to identify the persons who were smoking. Baca is entitled to summary judgment on this claim.

### c. Officer Duran

Plaintiff alleges that Officer Duran was the movement officer and when he asked her to move him on three or four occasions because he could not bear the second-hand smoke, she said her hands were tied. It is undisputed that Duran could move Plaintiff with the approval of her supervisor. She claims, however, that Plaintiff actually wanted to be moved closer to a friend. There is a disputed issue of material fact on whether Duran was deliberately indifferent by ignoring Plaintiff's repeated requests to be moved due to exposure

to second-hand smoke. Although she may not have had ultimate authority to move Plaintiff, she obviously had the ability to refer Plaintiff's request to her supervisor. Her lack of action would permit a jury to infer that she was deliberately indifferent, if the jury believes Plaintiff's version of events. The Court will deny summary judgment for Duran on Count I.

**IV.  Count II:  Work Program**

　　**A.  Factual Background**

Plaintiff's second count for relief is a claim under Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act. Plaintiff alleges that his mental impairment – bipolar paranoid schizophrenia – was the sole basis for Deputy Warden Baca's refusal to grant him a Level B-2 clearance, which would have entitled him to a higher-paying job in the Arizona Corrections Industries ("ACI") program and instead he worked a lower-paying job with a Level A clearance in the Work Incentive Pay Program ("WIPP"). Defendants assert that other factors in addition to Plaintiff's mental impairment were the basis for the decision, including his criminal history, prison disciplinary history, and substance abuse history.

Plaintiff controls his mental impairment with nightly medication (Am. Compl. at 5-5A, Doc. #22). He asserts that without it, he could not perform any job. Before Plaintiff was transferred to the Barchey Unit, he was living in a mental health unit. Mental health professionals raised his mental health score from 1 to 3 (DSOF ¶ 10 & Doc. #49, Ex. B; Baca Aff. ¶ 18). An inmate with a score of 3 is considered "moderate need," which requires placement in an institution that has full-time psychological and psychiatric services (PSOF, Ex. C). A score of 1 represents "no need" and 5 is "acute need" (Id.). The score was based on an evaluation of Plaintiff's psychiatric condition and mental impairment, his ability to function in an open unit, the danger he presents to himself and others, and the need for treatment (Baca Aff. ¶ 9 & Ex. A-1, Dep't Ord. 801.01 (1.5)). The mental health needs score is one of ten types of scores used in a Corrections Classification Profile to classify inmates (Id. at 801.01 (1.1)).

1         On July 3, 2003, Plaintiff was transferred to the Barchey Unit (Baca Aff. ¶ 22).
2    Barchey Unit is a Level 3 prison, on a range of 2 to 5 for security needs (Id. ¶¶ 5, 10). When
3    he was at Barchey Unit, Plaintiff had a Level A clearance for the work program. An inmate
4    with a Level A clearance requires supervision by armed staff; in contrast, supervision of an
5    inmate with a B level clearance is by unarmed staff (Id. ¶ 34 & Ex. A-4, Dep't Ord. 713.02
6    (1.2)). The Level A clearance allowed Plaintiff to participate in the WIPP, and his jobs
7    included yard detail, dishwasher, program porter, and irrigation assistant (Id. ¶ 30). Even so,
8    he wanted a B-1 clearance. With a B-1 clearance, Plaintiff could have worked outside of the
9    double-fenced area around his unit, but still within the complex perimeter fence (Id. ¶ 31).
10   The B-1 clearance would also yield a higher-paying job (Am. Compl. at 5-5A, Doc. #22).

11        It is undisputed the Defendant Deputy Warden Baca was the person with final
12   authority over job assignments. Most inmates worked in WIPP (Baca Aff. ¶¶ 29-30). Baca
13   also reviewed requests to work in the ACI program, which was "a privilege and is strictly
14   voluntary" (Id. ¶¶ 32, 35 & Ex. A-3, Dep't Ord. 903.08 (1.1)). The ACI program employed
15   inmates in manufacturing and construction, operation, and maintenance (Id. ¶ 32). At the
16   complex where Plaintiff was located, the program included a contract with a trucking
17   company, which required inmates to have experience in mechanics and paint and body work
18   (Id. ¶ 33). These inmates, who must have a Level B-1 clearance, would be permitted to leave
19   the unit and to have access to large trucks and potentially dangerous tools, so it was critical
20   that the inmates be trustworthy and capable decisionmakers (Id. ¶¶ 33-34).

21        Inmates are given a Work Skill Needs Score, which is calculated by classification
22   specialists on the Institutional Classification Committee (Baca Aff. ¶ 28). Several factors are
23   considered, including the inmate's work history, need for supervision in the workplace, level
24   of work skills, attitude toward work and dependability (Id. & Ex. A-1, Dep't Ord. 801.01
25   (1.8)). Twice in June 2004, the committee declined to recommend an exception that, if
26   approved by Baca, would have allowed Plaintiff a higher clearance level than A-2 (Id. ¶ 36).
27   The "Work Assignment Screening/Exception" form indicated that the reason for Plaintiff's
28   A-2 recommended supervision level is "MH-3," or a mental health score of 3 (Id. at Ex. A-

- 8 -

1  5). Baca accepted the committee's recommendation as in the best interest of other inmates,
2  staff and public, and signed the form (Id. ¶ 37 & Ex. A-5).
3        In his review of Plaintiff's work classification, Baca determined that (1) Plaintiff's
4  criminal history reflected that he had been released from prison and had committed more
5  crimes or violated the conditions of his release, resulting in his return to prison; (2) his prison
6  disciplinary record indicated that he acted before considering the outcome of his actions;
7  (3) his extensive drug history showed his willingness to smuggle, hide and use illegal drugs
8  if given the opportunity; and (4) that his mental health score was raised during his stay in a
9  mental-health facility, and his status could contribute to poor decisions that could result in
10 injury to another inmate, staff member, or member of the public (Baca Aff. ¶¶ 18, 38).
11       Specifically, in October 2000, Plaintiff had been released on community supervision
12 and three weeks later, was returned to prison when he violated the terms of his release (Baca
13 Aff. ¶ 16). He was released on a detainer in February 2001, and in September 2001, he was
14 returned to prison on a new felony drug conviction (Id. ¶ 17). On October 17, 2002, Plaintiff
15 was found guilty of three disciplinary infractions for fighting, staff obstruction, and
16 disobeying an order (Id. ¶ 19). On October 30, 2002 he was found guilty of another
17 disciplinary violation for disobeying an order and on November 18, 2002, for staff
18 obstruction (Id. ¶¶ 20-21). Baca "concluded that [Plaintiff] had a long history of exercising
19 extremely poor decisionmaking and a lack of self-control, thus making him a safety and
20 security risk in a job such as the [trucking position] which involved work around large
21 vehicles and dangerous tools" (Id.).
22       Plaintiff submits a copy of Baca's reply to an inmate, stating that Dr. Whittier could
23 make a recommendation for a B-1 clearance despite Plaintiff's mental health score, and that
24 Plaintiff should have his CO II submit a form asking for an evaluation (PSOF, Ex. E).
25 Plaintiff asserts in his Amended Complaint that Baca told him to get the clearance through
26 the medical unit, but "they said that was not true" (Am. Compl. at 5, Doc. #22). He returned
27 to Baca, who allegedly said that as long as Plaintiff's mental health score was 3, he would
28 never get the clearance (Am. Compl. at 5; PSOF ¶ 31 & Ex. L, Pl.'s Aff. ¶ 12). Baca

- 9 -

1 allegedly also told Plaintiff that the only way to get lowered to a 2 was to stop taking his
2 medication, but Plaintiff decided not to do that (Pl.'s Aff. ¶ 12).

3      After working for 14 months in WIPP at the Barchey Unit, on September 9, 2004,
4 Plaintiff was transferred to the Bachman Unit. A month later on October 11, 2004, he was
5 granted a B-1 clearance (PSOF ¶ 28). A work evaluation for his performance from April
6 2005 to the present time characterizes Plaintiff as a diligent worker who meets production
7 standards for the assembly of global positioning satellite systems and who works well with
8 other employees (Id. at Ex. I). His mental health score is still a 3 (Id. ¶ 30).

9 **B. Analysis**

10      Plaintiff cannot bring an ADA or Rehabilitation Act claim against the Defendant Baca
11 in his individual capacity. See, e.g. Vinson v. Thomas, 288 F. 3d 1145 (9th Cir. 2002);
12 Garcia v. S.U.N.Y. Health Sciences Center, 280 F.3d 98, 107 (2d Cir. 2001); Alsbrook v.
13 City of Maumell, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (en banc). Thus, the claim is
14 against Defendant Baca in his official capacity for monetary and injunctive relief.

15 **1. Injunctive relief**

16      Plaintiff's request for injunctive relief is not viable. He seeks a revision of policy so
17 that "inmates with a mental health score of 3 that are functional and qualified have the same
18 opportunity to work at C.M.C. or Hickman's Egg Ranches" (Am. Compl. at 7, Doc. #22).
19 The request is not narrowly drawn nor the least intrusive means necessary to correct the
20 alleged violation. See 18 U.S.C. § 3626(a)(1); Oluwa v. Gomez, 133 F.3d 1237, 1239 (9th
21 Cir. 1998). A more narrowly drawn request would be to require Warden Baca to allow
22 Plaintiff to have the trucking position at Barchey Unit. Even had Plaintiff made that request,
23 it is undisputed that (1) Plaintiff had been transferred from Barchey Unit, (2) he currently has
24 a job with a B-3 clearance as an assembler for global positioning systems, and (3) Warden
25 Baca is now at the Mohave Unit. These circumstances have mooted his claim. Thus, the
26 Court will grant summary judgment to Defendants on the request for injunctive relief.

27
28

### 2. Monetary relief

Defendants do not dispute that they may be liable for money damages in their official capacities. Since the filing of their motion, the Supreme Court decided <u>United States v. Georgia</u>, 126 S. Ct. 877, 882 (2006), which held that money damages claims against States are permissible under Title II, at least to the extent that the claims were based upon conduct that independently violated § 1 of the Fourteenth Amendment. Defendants have not, however, modified their position since <u>Georgia</u> was decided; therefore, the Court turns to Plaintiff's Title II claim.

Under Title II, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; <u>see also</u> 29 U.S.C. § 794(a). Plaintiff bears the burden of proof on these elements. <u>Crowder v. Kitagawa</u>, 81 F.3d 1480, 1486 (9th Cir. 1996). Defendants contend that Plaintiff has failed to show that (1) he has a disability, (2) he is a qualified individual, and (3) he was discriminated against because of his disability. The Court agrees that Plaintiff's evidence fails on the second prong: whether he was a "qualified individual".

Under Title II, a "qualified individual" is a disabled person who "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2); <u>see also</u> 28 U.S.C. § 794 ("otherwise qualified individual"). The evidence shows that although Plaintiff was eligible for WIPP, he did not meet the essential eligibility requirements for a job in the ACI program. The classification committee reviewed his history and recommended an A-2, not a B-1, clearance. Warden Baca accepted this recommendation, based upon Plaintiff's history of recidivism, drug use, and disciplinary infractions, in addition to the fact that his mental health contributed to his lack of decision-making skills. Baca could rely on reasonable assessments of the mental health professionals in determining whether Plaintiff met the essential eligibility requirements for a State-offered program. See <u>Olmstead v. L.C. ex rel Zimring</u>, 527 U.S. 581, 602 (1999). There is no evidence to show that the score given by mental

1 health professionals was unreasonable; rather, the evidence shows that Plaintiff's score is still
2 unchanged.

3      Although Plaintiff has shown that he was transferred from Barchey to Bachman and
4 given a B-1 clearance, he has not shown that the circumstances at both Barchey and
5 Bachman were the same. Notably, before he obtained the B-1 clearance at Bachman, he had
6 successfully worked at Barchey for 14 months and he had no new disciplinary infractions.
7 There is also nothing in the record to show that the assembly position at Bachman involved
8 use of potentially dangerous tools as did the trucking position at Barchey. The Court finds
9 that Plaintiff has not shown that he met the essential eligibility requirements for the ACI
10 program while he was incarcerated the Barchey Unit. Defendants are therefore entitled to
11 summary judgment.

12 **V. Count II: Grievance Process**

13      Plaintiff's claim regarding the grievance process was added to the Amended
14 Complaint and never screened. In Count II, Plaintiff alleges that Defendant Baca, by telling
15 Plaintiff that his job classification decision was final and non-grievable, denied Plaintiff
16 access to the grievance process. See also PSOF Ex. G & Ex. H ¶ 18. Defendants assert that
17 Baca's decision was correct because under policy, inmates may not appeal work decisions
18 (Baca Aff. ¶ 39 & Attach. 4, ADC DO 713.03, § 1.4). The policy is explicit; it states simply:
19 "Inmates cannot appeal work assignment decisions." Indeed, one of Plaintiff's exhibits
20 shows that an inmate who tried to grieve the same issue regarding a B-1 clearance was told
21 that the deputy warden's decision was final (PSOF Ex. L).

22      Defendants contend that instead, Plaintiff should have exhausted administrative
23 remedies by challenging the job-appeal policy or Baca's enforcement of the policy. The
24 Court is not persuaded by this contention. Inmates are required to exhaust "available"
25 remedies, Brown v. Valoff, 422 F.3d 926, 934-35 (9th Cir. 2005), and the plain language of
26 the policy makes it clear that no remedy is available. Moreover, Baca has not disputed that
27 he told Plaintiff that he could not grieve the work assignment decision. For Defendants to
28

expect Plaintiff to grieve Baca's enforcement of the policy is nonsense. The Court finds that the grievance system was not available for Plaintiff's challenge to his work assignment.

Even so, Plaintiff's claim that his First Amendment rights were denied because he could not grieve the matter fails. An inmate has no free-standing constitutional right to a grievance process. In Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988), the Ninth Circuit held that a prisoner does not have a protected liberty interest in prison grievance procedures. Other circuits have held similarly. See Antonelli v. Sheahan, 81 F.3d 1422, 1430 (7th Cir.1996); Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994); Flick v. Alba, 932 F.2d 728, 729 (8th Cir. 1991). In addition, Plaintiff has not been precluded from bringing this lawsuit, in light of the Court's finding that the exhaustion requirement was satisfied by the unavailability of a grievance process for Plaintiff's claim. Thus, Plaintiff's right of access to the courts was not frustrated. Defendants are therefore entitled to summary judgment on this claim.

**IT IS ORDERED:**

(1) Defendants' Motion for Summary Judgment (Doc. #52) is **granted in part and denied in part.**

(2) Defendants Schriro and Baca and Count II are dismissed with prejudice. The remaining claim for trial is Count I against Defendant Duran.

DATED this 31st day of August, 2006.

Stephen M. McNamee
United States District Judge